UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDS SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:                           │
│ DATE FILED:  3/31/10             │
└─────────────────────────────────┘
```

OSCAR BAIDE-FERRERO,

                    Petitioner,

  -v-

ROBERT ERCOLE,

                    Respondent.

No. 06 Civ. 6961 (RJS)
ORDER ADOPTING
REPORT AND RECOMMENDATION

RICHARD J. SULLIVAN, District Judge:

Presently before the Court is the Report and Recommendation (the "Report") of the Honorable Henry B. Pitman, Magistrate Judge, recommending that the petition for a writ of habeas corpus be denied.[1] For the reasons set forth below, the Court adopts the Report in its entirety.

Judge Pitman issued the Report on March 3, 2010. Pursuant to Federal Rules of Civil Procedure 72(b)(2) and 6(d), Petitioner's objections were due by March 22, 2010. As of the date of this Order, Petitioner has not filed objections to the Report.

"'To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record.'" *Cuadrado v. N.Y. City Dep't of Corr.*, No. 08 Civ. 3026 (PAC) (THK), 2009 WL 1033268, at *1 (S.D.N.Y. Apr. 16, 2009) (quoting *Wilds v. United Parcel Serv.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)). After a careful review of Judge Pitman's thorough and well-reasoned Report, the Court finds no clear error and adopts the Report in its entirety. For the reasons set forth therein, the petition for a writ of habeas corpus is DENIED, and the Clerk of the Court is respectfully directed

---

[1] The Report is attached as an exhibit to this Order.

to close this case.


SO ORDERED.

DATED:     March 31, 2010
           New York, New York


RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

Copies of this Order have been mailed to:

Oscar Baide-Ferrero
# 02-A-0103
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

EXHIBIT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X

OSCAR BAIDE-FERRERO,                    :

                    Petitioner,    :    06 Civ. 6961 (RJS)(HBP)

     -against-                          :    REPORT AND
                                             RECOMMENDATION
ROBERT ERCOLE,                          :

                    Respondent.    :

--------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE RICHARD J. SULLIVAN, United States

District Judge,

I.   Introduction

          Petitioner Oscar Baide-Ferrero, by his pro se petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeks

an Order vacating a judgment of conviction entered on December

12, 2001, after a jury trial, by the Supreme Court of the State

of New York, Bronx County (Fisch, J.), for murder in the second

degree, in violation of New York Penal Law Section 125.25(2)

(depraved indifference).  By that judgment, petitioner was

sentenced to an indeterminate term of imprisonment of twenty

years to life.  Petitioner is currently incarcerated pursuant to

that judgment.

For the reasons set forth below, I respectfully recommend that the petition be denied.

II.  <u>Facts</u>

    A.  Facts Underlying
       <u>Petitioner's Conviction</u>

        1.  <u>The Prosecution's Case</u>

Petitioner's conviction arises out of the stabbing death of Derrick Lopez outside of a Bronx bar and dance club during the early morning hours of July 15, 2000.  The prosecution offered evidence at trial sufficient to prove the following facts.

During the night of July 14-15, 2000, petitioner was a patron at the Tijuana Club, a dance club and bar located in the Bronx.  During the evening, petitioner played pool and danced three times with Brenda Matos, a taxi dancer at the club (Tr.[1] 70, 80, 88).  Petitioner gave Matos twenty dollars for the dances; she kept six dollars and returned fourteen dollars to petitioner (Tr. 88).

Shortly after 4:00 a.m., as the club was closing, Matos observed petitioner arguing with Lopez outside the club and then observed the two pushing each other (Tr. 72, 92, 125).  Matos

_____

[1]"Tr." refers to the transcript of petitioner's trial.

2

asked Lopez what was going on, and Lopez stated that petitioner
had called him a "bendejo," a Spanish expletive, suggesting
stupidity or homosexuality (Tr. 72, 92, 118).  Lopez and Matos
agreed to leave petitioner and to go to Manhattan (Tr. 72).
Lopez and Matos hailed a cab outside the club and entered the
back seat of the cab (Tr. 72, 96).  As the two were about to
leave, petitioner pulled open the door on Lopez's side of the cab
and demanded that Matos return the six dollars he had previously
paid her (Tr. 72, 96).  Matos returned the money to petitioner
(Tr. 72, 97), and then saw petitioner striking Lopez in the chest
(Tr. 73, 97).  Matos asked petitioner why he was hitting Lopez
and attempted to grab petitioner's hand (Tr. 73, 97-98).  Peti-
tioner then withdrew, and the cab drove away (Tr. 73).

   After leaving the scene of the confrontation, Matos
discovered that her hand was bleeding and that Lopez was slumped
over, bleeding and making jerking motions (Tr. 73, 100-01).  The
taxi driver took the couple to Saint Barnabas Hospital where
Lopez subsequently died from a stab wound to the heart (Tr. 79,
102-03, 168, 412-13, 430-46).  Because she was afraid she would
be suspected of assaulting Lopez, Matos left Lopez at Saint
Barnabas and went to another hospital where she received twelve
stitches to close the wound in her hand (Tr. 103-05).

   In addition to Matos' testimony, the prosecution
offered the testimony of Hugo Maradiag, a taxi dispatcher who was

3

working a few doors down the street from the Tijuana Club at the time of the fatal altercation (Tr. 215). He testified that shortly before the altercation, he observed two men and a woman exit the Tijuana Club (Tr. 217). The man believed to be Lopez then argued with the second male (Tr. 217), who Maradiag identified as petitioner (Tr. 221). One of the men and the woman started to get into a cab, and Maradiag then saw petitioner approach the cab, partially enter the back seat and make three jabbing motions (Tr. 217-18).

### 2.  The Defense Case

Petitioner testified at trial and attempted to mount a case of self-defense.

Petitioner admitted to playing pool and to dancing several times with Matos (Tr. 492-94). According to petitioner, he asked Matos to accompany him to his house and have sex with him, and Matos agreed to do so in return for $100 (Tr. 497-98). Petitioner testified that Matos left the club immediately before him and met with Lopez a few moments later who argued with Matos about her being with petitioner (Tr. 498-500). As Matos entered a taxi, Lopez began to argue with petitioner (Tr. 499-500).

Petitioner testified that Matos then called him over to the taxi to return the dance fees to him (Tr. 500-01). As petitioner was standing in the cab's doorway, Lopez slipped by

4

him, entered the back seat, told Matos to keep the money that she
was going to return to petitioner, called petitioner a "cock-
sucker" and pulled out a knife (Tr. 500-05, 529-31).   Petitioner
testified that he and Lopez then had a life or death struggle
over the knife and that the struggle ended with no apparent
injury to either party (Tr. 505-06, 555, 561); petitioner testi-
fied that he never knew that Lopez was injured (Tr. 507).
Petitioner then left the area and walked home (Tr. 507).

On cross examination, petitioner added that as Lopez
and Matos' taxi was leaving the area, three men came out of
Tijuana Club and banged on the taxi in an effort to commandeer it
down (Tr. 536).   Petitioner also added that while these individu-
als were banging on the cab, unidentified police officers arrived
and told everyone to leave the area (Tr. 536).

B.   Post-Conviction
State-Court Proceedings

Petitioner appealed his conviction to the Appellate
Division of the Supreme Court for the First Department.   Peti-
tioner's brief asserted three claims:   (1) the prosecutor commit-
ted misconduct by his questioning concerning a videotaped state-
ment given by petitioner and his misuse of an inaccurate photo-
graph of the scene of the crime; (2) the admission of the inaccu-
rate photograph prejudiced petitioner and (3) the sentence was
excessive given that the murder was petitioner's first conviction

5

(see Affidavit of Assistant District Attorney Andrew S. Holland,

sworn to January 8, 2007 ("Holland Aff."), Ex. 1).

The Fist Department affirmed petitioner's conviction

and sentence, stating:

> Defendant's claim that, in cross-examining defen-
> dant, the prosecutor misrepresented the contents of a
> videotaped statement by defendant that was not placed
> in evidence does not warrant reversal.  The court
> provided sufficient relief by narrowly tailoring the
> permissible scope of inquiry, and the ensuing cross-
> -examination did not deprive defendant of a fair trial
> (see People v Overlee, 236 AD2d 133, 143 [1997], lv
> denied 91 NY2d 976 [1998]).

> Without objection, a photograph of the scene was
> introduced into evidence.  The manner in which the
> prosecutor used this photograph in examining a witness
> could not have misled the jury as to the actual posi-
> tion of a certain taxicab at the time of the incident
> (see People v Cruz, 5 AD3d 190 [2004], lv denied 2 NY3d
> 798 [2004]).  It was made clear to the jury that a car
> in the photograph was not the taxi whose position was
> at issue, and that the depicted vehicle's position did
> not represent that of the taxicab at the time of the
> crime.

We perceive no basis for reducing the sentence.

People v. Ferrero, 14 A.D.3d 447, 447, 788 N.Y.S.2d 367, 368 (1st

Dep't 2005).  The New York Court of Appeals denied leave to

appeal.  People v. Ferrero, 4 N.Y.3d 886, 831 N.E.2d 976, 798

N.Y.S.2d 731 (2005).[2]

---

[2]In the interest of completeness, I also note that on or
about November 29, 2005, petitioner filed a motion to vacate his
conviction pursuant to New York Criminal Procedural Law Section
440.10, arguing that his trial counsel was ineffective (Holland
Aff. Ex. 3).  The Trial Court denied that motion on May 25, 2006
(Holland Aff. Ex. 5), and petitioner took no appeal.  Petitioner
(continued...)

C.  Petitioner's Claims

Petitioner asserts that his conviction should be vacated because the prosecution engaged in misconduct which petitioner alleges substantially prejudiced him.  First, petitioner claims that the prosecutor engaged in misconduct by asking petitioner questions that misrepresented to the jury what petitioner said in a post-arrest statement[3] that was not shown to the jury and by using an allegedly inaccurate photo of the scene of the homicide.  Second, petitioner claims that he was prejudiced by the introduction an allegedly inaccurate photograph of the crime scene.

Petitioner has filed a traverse in which he asserts that his sentence should be reduced in the interests of justice and also appears to assert that his conviction is against the weight of the evidence.  Although these latter two claims are not properly asserted because they are not in the petition and it does not appear that the claim concerning the weight of the

---

[2] (...continued)
raises no issue here concerning the performance of his trial counsel

[3] After his arrest, petitioner gave an oral statement which was summarized by a police officer, signed by petitioner and orally affirmed on video tape (Tr. 510-13, 543-44).  Although petitioner was questioned concerning his post-arrest statement, neither the written summary of petitioner's statement nor the video tape statement were offered in evidence.  There is no explanation in the record why they were not offered.

evidence was ever asserted in state court, these claims are so fatally flawed that I shall, nevertheless, address them in the interest of avoiding additional proceedings in this matter.

III. Analysis

A. Non-Cognizable Claims

A fundamental aspect of habeas corpus review is that only violations of federal law are cognizable in a federal habeas corpus proceeding; a violation of state law provides no basis for habeas relief. 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law. Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." (internal quotations and citations omitted)); accord Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 157 (2d Cir. 2009); Howard v. Walker, 406 F.3d 114, 121 (2d Cir. 2005) (noting that a challenge to a conviction obtained in violation of state law is not cognizable in federal court); DiGuglielmo v. Smith, 366 F.3d 130, 136-37 (2d Cir. 2004) (same); Urena v. Lape, 373 F. Supp. 2d 449, 454-55 (S.D.N.Y. 2005) (Marrero, D.J.) (same); Smith v. Artus, 03 Civ. 9819 (AKH), 2005 WL 1661104 at *7 (S.D.N.Y. July 14, 2005) (Hellerstein, D.J.) (same); Adams v. Greiner, 02 Civ. 6328 (GEL), 2004 WL 912085 at *2 (S.D.N.Y. Apr. 29, 2004) (Lynch, D.J.)

8

("Habeas corpus is not an extension of the appeals process in the state court.  Rather, it is a remedy for violations of a defendant's rights under the federal constitution, and a very narrow remedy at that.").

Petitioner's traverse does not specify what constitutional right, if any, he believes has been violated by his sentence.  Rather than assert a constitutional claim, it appears that petitioner is attempting to reprise the argument he asserted before the Appellate Division, namely that his sentence should be reduced in the interest of justice (compare Petitioner's Traverse (Reply) in Opposition to Respondent's Answer and Memorandum of Law, dated September 24, 2009 ("Pet.'s Traverse") (Docket Item 19), at 9-10 with Holland Aff. Ex. 1 at 29-33).

Although New York's Appellate Division has discretion to reduce a sentence in the interest of justice, see N.Y. Crim. Proc. L. § 470.15(3), (6)(b), a federal habeas court considering a state-court conviction has no such power, and a claim that a sentence should be reduced in the interest of justice does not allege a violation of a federally protected right.  See Stallings v. Woods, 04 CV 4714 (RLM), 2006 WL 842380 at *22 (E.D.N.Y. Mar. 27, 2006), citing Medina v. Greene, 03 Civ. 8646 (DC), 2004 WL 2809196 at *4 (S.D.N.Y. Dec. 7, 2004) (Chin, D.J.) (petitioner "did not fairly present the excessive sentence claim in federal constitutional terms" by appealing to the Appellate Division's

9

power under N.Y. Crim. Proc. Law § 470.15, to reduce an excessive sentence in the interest of justice); Rivera v. Greiner, 272 F. Supp. 2d 197, 201 (E.D.N.Y. 2003); see also White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam).  It is, therefore, not cognizable in this proceeding.

Moreover, even if I read petitioner's claim to assert that his sentence is so disproportionately long that it is cruel and unusual and a violation of the Eight Amendment, see Herrera v. Artuz, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001) (Baer, D.J.) (construing excessive sentence claim of pro se habeas petitioner to assert an Eighth Amendment violation), it fails on the merits. A sentence within the range established by state law is ordi-narily not subject to an Eighth Amendment challenge.  White v. Keane, supra, 969 F.2d at 1383; Diaz v. Herbert, 317 F. Supp. 2d 462, 479-80 (S.D.N.Y. 2004) (Marrero, D.J.); Brown v. Goord, 02 Civ. 2122 (NRB), 2002 WL 31093611 at *5 (S.D.N.Y. Sept. 13, 2002) (Buchwald, D.J.); Espinal v. Barkely, 95 Civ. 1214 (HB), 1996 WL 673833 at *1 (S.D.N.Y. Nov. 20, 1996) (Baer, D.J.); Rodriguez v. O'Keefe, 96 Civ. 2094 (LLS), 1996 WL 428164 at *7 (S.D.N.Y. July 31, 1996) (Stanton, D.J.), aff'd mem., 122 F.3d 1057 (2d Cir. 1997); see Thomas v. Senkowski, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) (Koeltl, D.J.) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal

habeas relief."); <u>see also</u>, <u>e.g.</u>, <u>Townsend v. Burke</u>, 334 U.S. 736, 741 (1948) (severity of sentence generally not reviewable on habeas).

An indeterminate sentence of twenty years to life for murder in the second degree is clearly permitted under New York Law.  N.Y. Penal L. §§ 70.00(2)(a), (3)(a)(i), 125.25 (authorizing indeterminate sentence of 25 years to life for murder in the second degree).  In addition, sentences of equal or longer duration for the same crime have routinely been upheld in the face of challenges under the Eighth Amendment.  <u>Ayala v. Walsh</u>, 05-CV-1497 (JS), 2009 WL 4282034 at *9 (E.D.N.Y. Nov. 23, 2009) (upholding a sentence of 25 years to life for murder in the second degree); <u>Garrett v. Smith</u>, 05-CV-3374 (JFB), 2006 WL 2265094 at *12 (E.D.N.Y. Aug. 8, 2006)("Petitioner was sentenced to 25 years to life imprisonment [for second degree murder] and, as his sentence falls within the range established by state law, his claim is not cognizable for federal habeas corpus review."); <u>Williams v. Mantello</u>, 378 F. Supp. 2d 229, 240-41 (W.D.N.Y. 2005)(upholding a sentence of 25 years to life for second degree murder); <u>Tobias v. Portuondo</u>, 367 F. Supp. 2d 384, 398 (W.D.N.Y. 2004)(same); <u>Collins v. Greiner</u>, 02-CV-4727 (JBW), 2003 WL 22953067 at *12 (E.D.N.Y. Oct. 15, 2003)(same); <u>Pina v. Kuhlmann</u>, 239 F. Supp. 2d 285, 288-89 (E.D.N.Y. 2003); <u>see also</u> <u>Duran v. Phillips</u>, 04 Civ. 302 (LTS)(FM), 2008 WL 3919195 at *9 (S.D.N.Y.

11

Aug. 22, 2008) (Swain, D.J. & Maas, M.J.) (sentence of thirty-seven and one-half years to life for convictions of murder in the second degree and attempted murder in the second degree did not raise an Eighth Amendment issue).

Thus, petitioner is not entitled to any relief in connection with his sentencing.

To the extent petitioner is claiming that the jury's guilty verdict was against the weight of the evidence, he has also failed to state a cognizable claim.

As explained in Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001), a claim that a verdict is against the weight of the evidence is purely a state law claim that is not cognizable in a federal habeas corpus proceeding:

> Correa argues that the guilty verdict was against the weight of the evidence.  This claim is distinct from an attack on a verdict based on the legal sufficiency of the evidence.  A "weight of the evidence" argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles.  See Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Fourteenth Amendment requires record evidence to reasonably support a finding of guilt beyond a reasonable doubt); [s]ee People v. Bleakley, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987) (weight of the evidence is based on court's factual review power; sufficiency of evidence claim based on the law).  Accordingly, the Court is precluded from considering the claim.  See 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (habeas corpus review is not avail-

12

able where there is simply an alleged error of state law).

Accord Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (Sweet, D.J.); see also Feliz v. Conway, 378 F. Supp. 2d 425, 430 n.3 (S.D.N.Y. 2005) (Patterson, D.J.); Keane v. N.Y. State Div. of Parole, 04 CV 2070 (CBA), 2005 WL 1594200 at *2 n.1 (E.D.N.Y. July 5, 2005); Brown v. Filion, 03 Civ. 5391 (DLC) (GWG), 2005 WL 1388053 at *12 (S.D.N.Y. June 13, 2005) (Gorenstein, M.J.), report & recommendation adopted by 2005 WL 2159675 (S.D.N.Y. Sept. 6, 2005) (Cote, D.J.) ; Roman v. Filion, 04 Civ. 8022 (KMW)(AJP), 2005 WL 1383167 at *30 (S.D.N.Y. June 10, 2005) (Report & Recommendation)(Peck, M.J.).

Petitioner's sufficiency argument seems to be limited to an attack on the credibility of the prosecution's witnesses (Pet.'s Traverse at 6-7, 11-12). It is, however, well settled that a federal habeas corpus court cannot generally revisit a jury's assessments of the weight of the evidence or the credibility of witnesses. See Quartararo v. Hanslmaier, 186 F.3d 91, 95, 96 (2d Cir. 1999), citing Herrera v. Collins, 506 U.S. 390, 401 (1993) (federal habeas courts must not assume "the position of a thirteenth juror;" "inconsistencies were for the jury to resolve" not the district court); United States v. Gonzales, 110 F.3d 936, 941 (2d Cir. 1997) (weight of the evidence is for the jury to decide); Callender v. McGuiness, 05 Civ. 942 (KMW)(GWG), 2005 WL 2461808 at *8 (S.D.N.Y. Oct. 6, 2005) (Report & Recommendation)

13

(Gorenstein, M.J.) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and thus a habeas court will defer to the jury's assessments of both of these issues." (internal quotation marks omitted)); Brown v. Filion, supra, 2005 WL 1388053 at *13 (A "habeas court will not reevaluate [the] jury's choice to credit [an] eyewitness's testimony notwithstanding alleged inconsistencies."); Messiah v. Duncan, 99 Civ. 12178 (RCC) (HBP), 2004 WL 1924791 at *7 (S.D.N.Y. Aug. 27, 2004) (Casey, D.J.) ("Petitioner's arguments concerning the discrepancies in the officers' descriptions are insufficient for habeas relief."), aff'd, 435 F.3d 186 (2d Cir. 2006); Wilson v. Senkowski, 02 Civ. 0231 (HB)(AJP), 2003 WL 21031975 at *11 (S.D.N.Y. May 7, 2003) (Report & Recommendation) (Peck, M.J.) ("Even if there had been major inconsistencies in the prosecution witnesses' testimony-which there [were] not-that would not change the result."); see also Ferguson v. Walker, 00 Civ. 1356 (LTS)(AJP), 2002 WL 31246533 at *9 (S.D.N.Y. Oct. 7, 2002) (Swain, D.J. & Peck, M.J.) (upholding jury verdict against petitioner despite inconsistent testimony); Simpson v. Portuondo, 01 Civ. 1379 (BSJ)(AJP), 2001 WL 830946 at *7-*8 (S.D.N.Y. July 12, 2001) (Report & Recommendation) (Peck, M.J.) (same); Roldan v. Artuz, 78 F. Supp. 2d 260, 269 (S.D.N.Y. 2000) (Batts, D.J. & Peck, M.J.) (same).

14

Thus, to the extent petitioner attacks the sufficiency of the evidence, his claim is also not cognizable.[4]

B. Cognizable Claims

1. Standard of Review

A habeas petitioner must meet a stringent standard before a federal court can issue the writ. Specifically, habeas relief may be granted only when the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly estab-lished Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1).

The Supreme Court has explained these alternative standards:

---

[4]I have not overlooked the fact that after petitioner's conviction, the New York Court of Appeals has considered and substantially altered the range of conduct that falls within the definition of murder by depraved indifference. People v. Suarez, 6 N.Y.3d 202, 211-12, 844 N.E.2d 721, 728, 811 N.Y.S.2d 267, 274 (2005), quoting People v. Payne, 3 N.Y.3d 266, 272, 819 N.E.2d 634, 637, 786 N.Y.S.2d 116, 119 (2004) ("'a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder'"). Petitioner, however, makes no claim under Suarez or Payne, and even if he did, the argument would probably be unsuccessful because the claim would not only be unexhausted, it would also be meritless because a habeas sufficiency claim must be assessed under the state of the law as of the time petitioner's conviction became final. Flowers v. Fisher, 296 F. App'x 208, 210 (2d Cir. 2008); Gaskin v. Graham, 08-CV-1124 (JFB), 2009 WL 5214498 at *10 (E.D.N.Y. Dec. 30, 2009).

First, we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). See also Early v. Packer, 537 U.S. 3, 7-8 (2002) (per curiam). . . .

Second, [petitioner] can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision involved an "unreasonable application" of clearly established law. As we have explained:

> "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. See Bell v. Cone, 535 U.S. 685, 698-699 (2002); Williams, supra, at 411. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner."

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam).

Price v. Vincent, 538 U.S. 634, 640-41 (2003); accord Waddington v. Sarausad, --- U.S. ---, ---, 129 S.Ct. 823, 831 (2009); Brown v. Payton, 544 U.S. 133, 141 (2005); see also Lockyer v. Andrade, 538 U.S. 63, 70-72 (2003); Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Hawkins v. Costello, 460 F.3d 238, 242-43 (2d Cir. 2006); Brown v. Artuz, 283 F.3d 492, 500-01 (2d Cir. 2002).

In addition to the definition of "unreasonable application" set forth above, a state court may unreasonably apply Supreme Court precedent "if the state court unreasonably extends a legal rule established by the Supreme Court or if it unreason-

16

ably fails to extend a legal rule to a context in which the rule reasonably should apply." Serrano v. Fischer, 412 F.3d 292, 296-97 (2d Cir. 2005). "Unreasonableness is determined by an 'objective' standard." Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005), quoting Williams v. Taylor, 529 U.S. 362, 409 (2000); Hawkins v. Costello, supra, 460 F.3d at 242-43.

Both the "contrary to" and "unreasonable application" clauses "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, supra, 529 U.S. at 412. "[C]learly established [f]ederal law . . . refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, 549 U.S. 70, 74 (2006) (internal quotations omitted); accord Thaler v. Haynes, No. 09-273, 2010 WL 596511 at *3 (U.S. Sup. Ct. Feb. 22, 2010) (" A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this Court."). "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002); Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied, 129 S.Ct. 1312 (2009). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied

Second Circuit precedent." Yung v. Walker, 341 F.3d 104, 110 (2d
Cir. 2003); accord DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d
Cir. 2002).

A ruling that is clearly erroneous is not necessarily a
ruling that constitutes an unreasonable application of federal
law. Lockyer v. Andrade, supra, 538 U.S. at 75 (The "objectively
unreasonable" and "clearly erroneous" standards "are not the
same. The gloss of clear error fails to give proper deference to
state courts by conflating error (even clear error) with unrea-
sonableness."); Davis v. Grant, supra, 532 F.3d at 140; Cotto v.
Herbert, 331 F.3d 217, 248 (2d Cir. 2003). However, "'the
increment [of error beyond clear error] need not be great;
otherwise, habeas relief would be limited to state court deci-
sions so far off the mark as to suggest judicial incompetence.'"
Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009), cert. denied,
130 S.Ct. 739 (2009), quoting Francis S. v. Stone, 221 F.3d 100,
111 (2d Cir. 2000).

To be entitled to the deferential standard of review
under either sub-paragraph of subsection 2254(d), the state
courts must have resolved the petitioner's claims "on the mer-
its." Cotto v. Herbert, supra, 331 F.3d at 230; see also Ryan v.
Miller, 303 F.3d 231, 245 (2d Cir. 2002) ("[I]n order for this
deferential standard of § 2254 to apply, we must first determine
that the state court considered [petitioner's claim] on its

merits."); <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 309-10 (2d Cir.
2001).

     The Second Circuit has instructed habeas courts to
"classify" a state court decision as either:  (1) "fairly appear-
ing to rest primarily on federal law or to be interwoven with
federal law"; or (2) "fairly appearing to rest primarily on state
procedural law."  <u>Jimenez v. Walker</u>, 458 F.3d 130, 145 (2d Cir.
2006).  "If the state court's decision falls into the first
category, and does not 'contain a clear statement of reliance on
a state procedural bar,' the decision must be treated as having
been made on the merits."  <u>Mateo v. Fishkill Corr. Facility</u>, 04
Civ. 3420 (DGT), 2007 WL 2362205 at *5 (E.D.N.Y. Aug. 14, 2007),
<u>quoting</u> <u>Jimenez v. Walker</u>, <u>supra</u>, 458 F.3d at 138.  To make this
classification, habeas courts in this circuit examine "(1) the
face of the state-court opinion, (2) whether the state court was
aware of a procedural bar, and (3) the practice of state courts
in similar circumstances."  <u>Jimenez v. Walker</u>, <u>supra</u>, 458 F.3d at
145 n.16.

     Here, upon examining these three factors, I conclude
that the Appellate Division adjudicated the merits of peti-
tioner's remaining claims on the merits.  First, the language
used by the Appellate Division demonstrates that it was address-
ing the substance of petitioner's claims; there is nothing in the
Appellate Division's decision that remotely suggests a procedural

basis for the court's decision. <u>People v. Ferrero</u>, <u>supra</u>, 14 A.D.3d 447, 788 N.Y.S.2d 367. In addition, although respondent argued in the Appellate Division that several of petitioner's claims were unpreserved (<u>see</u> Holland Aff. Ex 2 at 10-11, 17, 22, 24), there is no language in the Appellate Division's decision that even remotely suggests that the court was relying on a procedural defect in affirming the conviction. Finally, respondent does not assert here that the Appellate Division resolved petitioner's claims on procedural grounds, nor does he claim that the New York court's routinely dismiss claims similar to petitioner's on procedural grounds.

Accordingly, I conclude that the Appellate Division did resolve petitioner's claims on the merits and that the decision of the Appellate Division is, therefore, entitled to the AEDPA's deferential standard of review.

### 2. Facts Underlying Petitioner's Specific Claims

Petitioner's prosecutorial misconduct and evidentiary claims arise from testimonial and photographic evidence introduced by the prosecution.

On direct examination, petitioner testified that he was arrested approximately one week after Lopez's stabbing, taken to a police station and interrogated by a detective (Tr. 508-10). Petitioner testified that he told the detective the same facts

that he told the jury, that the detective took notes of peti-
tioner's statement and that petitioner signed the notes at the
detective's request (Tr. 510-11).   Petitioner subsequently
reviewed and reconfirmed the notes of his statement with an
assistant district attorney (Tr. 511-12).   Specifically, the
statement was read to petitioner while he was being video-taped
and he confirmed that the notes reflected his statement and were
correct (Tr. 512-13, 541).

As noted above, petitioner testified for the first time
on cross-examination that three men came up to the car after the
altercation between Lopez and petitioner and that they started
banging on the cab in an effort to commandeer it (Tr. 536).   The
prosecution then posed the following questions concerning this
newly added detail:

|  |  |
|---|---|
| Q. | When you were apprehended after eight days, you made a statement to the po-lice; right? |
| A. | Yes. |
| Q. | And this is a Spanish speaking police officer, right? |
| A. | Yes |
| Q. | And that's in the statement that was taken down from you? |
| MR. BRUNO: | Objection, your Honor.   Bad faith. |
| THE COURT: | Overruled. |
| A. | That is not there, because he would ask me, but he would not write. |

21

He told me at the end that every-
thing that I had told him, that was
written there, but I can't read it.

He told me that everything that I
told him was there, but I didn't read
it.

Q.      Now, after you made a statement to this
detective, you were interviewed by the
assistant prosecutor, correct?

A.      Yes.

Q.      You had your rights read to you, cor-
rect?

        *      *      *

Q.      I'm sorry.  Had you your rights read to
you?

A.      No, they didn't read my rights.  I don't
know.

Q.      Did they read your rights or not?

A.      I don't know what that is, because the
detective told me that everything that I
had said that he had written, and then
he told me to sign, and he told me to
say "yes", and then I would go home.

Q.      After you spoke to the detective, you
spoke to an assistant district attorney
at the precinct?

A.      There was a man with a video, and there
was an interpreter.

Q.      There was a person who spoke your lan-
guage, which is Spanish, correct?

A.      The interpreter, yes.

Q.      And you were asked and given the oppor-
tunity to give your version of what

22

                              happened here on July 15th, is that correct?

                              *      *      *

Q.                            You were asked questions on the video
                              tape, correct?

A.                            Yes.

Q.                            You speak for yourself on the videotape,
                              the detective does not speak for you?

A.                            Yes, I spoke for myself.

Q.                            And isn't it true, sir, you never men-
                              tioned anything about these three men
                              until you are sitting in this seat right
                              now?

MR. BRUNO:                    Objection, your Honor.  This is bad
                              faith.

(Tr. 537-40).

     At this point, the Trial Judge met with counsel in the

robing room and petitioner's counsel claimed that the questioning

created the mis-impression that the assistant district attorney

asked petitioner in an open-ended manner whether he wished to add

more details and that petitioner failed to mention the three men

who approached the cab (see Tr. 541-42).  The prosecutor re-

sponded that his questioning was fair in light of the suggestion

made during petitioner's direct examination that the detective

interrogating petitioner failed to take down all material aspects

of petitioner's post-arrest statement (Tr. 542-43).  The Trial

Court then resolved the dispute by directing the prosecutor to

ask the petitioner whether, prior to his testimony, he ever told

                                   23

the police about the three men who approached the taxi cab (Tr. 545). The Trial Court denied defense counsel's request to give the jury a curative instruction concerning the videotape; defense counsel never described the precise nature of the curative instruction he was seeking (Tr. 545-46).

After the robing room conference concluded, the prosecutor concluded his questioning concerning the three men as follows:

> Q.    Prior to, today did you tell a police officer, or anyone, about these three men you have just now testified to from that seat?
>
> A.    I told my lawyer, and I told you that I had spoken to a detective, and that came out. But it is not written in the paper that they gave me.
>
> Q.    But it is not written anywhere, you concede that, right, sir?
>
> A.    Because I had read the entire case.
>
> Q.    It is not written anywhere, is it, sir, in any piece of paper work, is it sir?
>
> A.    No, it is not written.

(Tr. 546-47).

Petitioner next claims that the prosecutor committed misconduct in his questioning concerning when petitioner first learned that Lopez had been injured. It appears from the questioning that petitioner admitted during post-arrest questioning to knowing on the day after the altercation that Lopez had been

24

injured, while at trial, he claimed that he was unaware of this fact until he was arrested one week later.  Although petitioner admitted that the summary of his statement,  which he had con- firmed was accurate, states that petitioner knew of Lopez's injuries on the day after the stabbing, he denied at trial that he made such an admission:

> Q.        And you weren't crying when the police
>           caught you or apprehended you -- my
>           apologies -- apprehended you eight days
>           later, were you, sir?
>
> A.        Because I didn't know what I had done.
>           And I didn't feel guilty for something
>           that I didn't know, until they told me
>           that they were looking for a person that
>           had assassinated somebody.
>
>           I never had the intention on me
>           because I didn't feel guilty of that.
>
> Q.        We talked at some length about your
>           statement to the police.
>
>           Do you recall that?
>
> A.        Yes.  That statement when they -- when I
>           came out of the bar, that's when they
>           arrested me.
>
> Q.        You indicated to the police that you
>           found out a day later that he had been -
>           - that he had been hurt?
>
> MR. BRUNO:      Injured.
>
> [PROSECUTOR]:   Injured, my apology.
>
> Q.        Injured?
>
> A.        Injured.

Q.              How did you find that out?

A.              I told the police that I noticed -- that
                I didn't notice until the day they ar-
                rested me, because that's a lot of
                things there that I didn't say.

Q.              How did you find out the next day, July
                16th, that you, sir, had injured this
                man?

MR. BRUNO:      Object to flaunting these photographs.

THE COURT:      Yes.

Q.              How did you find out that you injured
                him?

A.              I never told the police that.  I told
                them that I didn't know whether he was
                hurt or not or if I was hurt until the
                day they told me.  That was eight days
                later.

                     I never told that detective that I
                knew that man was hurt.  Never.

Q.              Do you recall telling the Assistance
                District Attorney on videotape that you
                knew the man was hurt the next day?

A.              That's on the papers, but I didn't say
                that.

Q.              Do you recall saying, yes, I agree, I
                knew the man was hurt on the videotape
                when the Assistant District Attorney
                asked you questions?

MR. BRUNO:      Objection.  Not so.

THE COURT:      I will allow it.  Overruled.

A.              I said to -- everything I said yes,
                because the detective, his name was
                Tiero, something like that.  He told me
                to say that everything I had said was on
                the paper.

                            26

THE WITNESS:    He told me to sign it, and to say yes to everything that they asked me, and then afterwards, I would go home. I was somehow drunk.

THE COURT:    Mr. Ferrero, did you tell the police that you learned the next day that Derrick Lopez was injured? Did you say that you knew -- you learned that the next day?

Did you ever tell that to the police; yes or no?

THE WITNESS:    No.

THE COURT:    You never told that to the police?

THE WITNESS:    I told them --

THE COURT:    That was it. You never told them that you learned the next day that he was injured? Just yes or no.

THE WITNESS:    No.

THE COURT:    Next question.

Q.    And, it's also your testimony under oath here today before this jury, that you didn't say to -- on the videotape to the Assistant District Attorney that you knew he was hurt the next day; is that your testimony, sir; yes or no?

A.    All the questions they asked me I say yes because the guy told me to say yes. And if I say yes, I would go home.

It was an error that I committed. I never thought that he had written different things on the paper.

Q.    But, you were asked specifically about this statement and you affirmed it to the prosecutor who asked you? You said, yes, you said that, yes, it's accurate;

27

> correct or incorrect, and now you are
> saying it's not?
>
> A.            I say yes.  I am not saying that I never
>              said no.  It was because the man told me
>              that whatever I said was written there.

(Tr. 569-73).

Finally, petitioner claims the prosecutor committed
misconduct by introducing a photograph, Exhibit 10, taken at some
point after the homicide, intended to illustrate the vantage
point from which Maradiag viewed the events in issue (Tr. 243-
44).  Although Exhibit 10 was received without objection from
petitioner (Tr. 234), petitioner now argues that the prosecutor
committed misconduct because the photograph depicted a car that
was not in the precise location of the taxi in which the fatal
stabbing occurred and that at one point during the examination
the prosecutor used a "zoom" feature to enlarge a particular
portion of the photograph.[5]  Maradiag did, however, expressly
describe the difference between the location of the car depicted
in the photograph and the location of the taxi on the night of
the homicide (Tr. 243-45).  The Trial Judge also directed that
the prosecutor not use the zoom feature, but rather that he
display the photograph in a manner that most accurately reflected
Maradiag's view (Tr. 246, 248-49).  After conferring with coun-

_____

[5]It appears that Exhibit 10 was projected on a device that
permitted the operator to zoom in on selected areas of the
photograph.

28

sel, the Trial Judge confirmed Maradiag's prior testimony that the photograph accurately reflected what Maradiag could see from the spot he occupied on the night of the stabbing (Tr. 233, 253).[6]

> 3. Analysis of
>    Cognizable Claims

>>    a. Prosecutorial
>>       Misconduct Claim

Prosecutorial misconduct will justify habeas relief only when the misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986), quoting Donnelly

---

[6]Specifically, Maradiag testified as follows:

| THE COURT: | Let me ask you, the way the photograph appears now on the screen, does that accurately reflect what you, as a dispatcher sitting to the left, would see? |
|---|---|
| THE WITNESS: | Yes. |
| THE COURT: | Yes? |
| THE WITNESS | Yes. |
| THE COURT: | And does it accurately portray the distance that you would see from where you're sitting at the dispatcher's table? |
| THE WITNESS: | Yes. |

(Tr. 253).

29

v. DeChristoforo, 416 U.S. 637, 643 (1974); accord Greer v.
Miller, 483 U.S. 756, 765 (1987), quoting United States v.
Bagley, 473 U.S. 667, 676 (1985) ("To constitute a due process
violation, the prosecutorial misconduct must be 'of sufficient
significance to result in the denial of the defendant's right to
a fair trial.'"); Bossett v. Walker, 41 F.3d 825, 829 (2d Cir.
1994), quoting Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir.
1990), quoting Darden v. Wainwright, supra, 477 U.S. at 181 ("The
appropriate standard of review for a claim of prosecutorial
misconduct on a writ of habeas corpus is 'the narrow one of due
process, and not the broad exercise of supervisory power.'").

Courts in this Circuit have considered the following
non-exhaustive factors in assessing whether prosecutorial miscon-
duct resulted in actual prejudice to a criminal defendant:  "(1)
the severity of the prosecutor's conduct; (2) what steps, if any,
the trial court may have taken to remedy any prejudice; and (3)
whether the conviction was certain absent the prejudicial con-
duct." Bentley v. Scully, supra, 41 F.3d at 824, citing Gonzalez
v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991); see also United
States v. Millar, 79 F.3d 338, 343 (2d Cir. 1996); United States
v. McCarthy, 54 F.3d 51, 55 (2d Cir. 1995); Floyd v. Meachum,
supra, 907 F.2d at 355; United States v. Modica, 663 F.2d 1173,
1181 (2d Cir. 1981).

The prosecutor's questions concerning petitioner's prior statements and his use of the photograph taken after the homicide were not improper.

Petitioner's testimony on cross-examination concerning the three individuals who approached the cab was a new detail that petitioner did not offer during his direct testimony. Thus, cross-examination concerning this newly added matter was entirely appropriate to impeach petitioner. As explained by the Honorable Robert W. Sweet, United States District Judge, a direct contradiction is not necessary for a prior statement to be considered inconsistent and grounds for impeachment:

> Under New York law, a defendant in a criminal proceeding has the right to cross-examine a witness over his or her omission of a material fact in earlier statements as a prior inconsistent statement. See People v. Savage, 50 N.Y.2d 673, 679, 431 N.Y.S.2d 382, 384, 409 N.E.2d 858, 861 (1980) ("[W]hen given circumstances make it most unnatural to omit certain information from a statement, the fact of the omission is itself admissible for purposes of impeachment."); see also Chesney v. Robinson, 403 F. Supp. 306, 310 (D. Conn. 1975), aff'd, 538 F.2d 308 (2d Cir. 1976) ("[A] failure to testify to a fact which would naturally have been mentioned is legally as inconsistent as a specific prior statement to the opposite effect.") (citing McCormick, Evidence § 34 (2d Ed. 1973)).
>
> Moreover, a prior statement need not directly and positively contradict a witness' testimony to be admissible for impeachment purposes. People v. Wise, 46 N.Y.2d 321, 326, 413 N.Y.S.2d 334, 336-37, 385 N.E.2d 1262, 1265 (1978). So long as the witness's trial testimony and the prior statement "are inconsistent and tend to prove differing facts," the prior statement is admissible for impeachment purposes. Id. at 326, 413 N.Y.S.2d at 337, 385 N.E.2d at 1265 (quoting Larkin v. Nassau Elec. R.R., 205 N.Y. 267, 269, 98 N.E. 465, 466

31

> (1912)).  "In case of doubt, . . . the balance should
> be struck in favor of admissibility, leaving to the
> jury the function of determining what weight should be
> assigned the impeachment evidence."  Id. at 327, 413
> N.Y.S.2d at 337, 385 N.E.2d at 1265.

Laboy v. Demskie, 947 F. Supp. 733, 740-41 (S.D.N.Y. 1996).

If petitioner's counsel believed the questioning
somehow distorted the record as to petitioner's post-arrest
statement or if petitioner's counsel was concerned that the
prosecutor's questions created a mis-impression regarding the
nature of the questions posed to petitioner during his video-
taped interview, his remedy was to clarify the matter through
redirect examination.  Petitioner's counsel did not address the
issue in his redirect examination, and there is simply no legal
basis to conclude now that appropriate cross-examination somehow
constituted prosecutorial misconduct.

Similarly, the prosecutor's questions concerning
alleged inconsistencies regarding when petitioner first learned
that Lopez had been injured was not misconduct.  Petitioner
admitted that the notes of his post-arrest statement reflected
that he stated that he knew of Lopez's injuries the day after the
stabbing (Tr. 571).  Since petitioner testified at trial that he
was not aware of Lopez's injuries until his arrest a week after
the stabbing, cross-examination on this inconsistency was also

32

proper.[7]  Again, if petitioner's counsel believed the testimony
created a misimpression on the part of the jury, his remedy was
redirect examination.

Finally, the prosecution's use of a photograph that was
not identical in all respects to the scene of the crime at the
time of the homicide was not misconduct because the photograph
was properly authenticated.  New York's authentication require-
ment for photographs was succinctly described by the Honorable
Nicholas G. Garaufis, United States District Judge, in James v.
Smith, 05-CV-4756 (NGG), 2008 WL 2622928 at *12 (E.D.N.Y. June
30, 2008):

> New York law has long required a photograph's authenti-
> cation before allowing its submission into evidence.
> See Alberti v. New York, Lake Erie & Western R.R. Co.,
> 118 N.Y. 77, 23 N.E. 35 (N.Y. 1889).  See also People

---

[7]Petitioner's brief on direct appeal argues that petitioner
never admitted in his post-arrest statement that he knew on July
16 that Lopez had been injured and that the prosecutor's
suggestion to the contrary was a "blatant misrepresentation"
(Holland Aff. Ex. 1 at 18).  If the prosecutor had no basis for
his question, petitioner's argument might have traction.
Petitioner, however, admitted that the notes of his post-arrest
statement indicated that he had said that he knew on July 16 that
Lopez was injured (Tr. 571 ("Q.  Do you recall telling the
Assistant District Attorney on videotape that you knew the man
was hurt the next day?  A.  That's on the papers but I didn't say
that.")).  Given petitioner's admission that the notes of the
post-arrest statement indicated that petitioner admitted to
knowing of Lopez's injuries the day after the stabbing and that
petitioner had previously confirmed the accuracy of the notes
(Tr. 511-12), there was good-faith basis for the prosecutor's
question.  Cf. Jenkins v. Artuz, 294 F.3d 284, 294 (2d Cir. 2002)
(prosecutorial misconduct found where prosecutor's questions
deliberately created misimpression that witness had no agreement
with district attorney's office).

33

v. Byrnes, 33 N.Y.2d 343, 352 N.Y.S.2d 913, 308 N.E.2d
435, 437 (N.Y. 1974); People v. Brown, 216 A.D.2d 737,
738, 628 N.Y.S.2d 835 (N.Y. App. Div.3d Dep't 1995).
"Photographs are authenticated by testimony of a per-
son[, not necessarily the photographer,] familiar with
the object portrayed therein that it is a correct
representation of such object." Brown, 628 N.Y.S.2d at
836, 216 A.D.2d at 738; accord Byrnes, 33 N.Y.2d at
347-48, 352 N.Y.S.2d 913, 308 N.E.2d at 437-38. . . .
Additionally, New York's authentication rule bears a
high degree of similarity to Fed.R.Evid. 901, which
requires "authentication ... [that] is satisfied by
evidence sufficient to support a finding that the
matter in question is what its proponent claims."

Maradiag clearly and unequivocally testified that the

photograph accurately portrayed what he could see from his

vantage point at the taxi stand (Tr. 233, 253), and the photo-

graph was received without objection from defense counsel (Tr.

234-35). Any issues concerning whether the car in the photograph

was in precisely same position as the taxi in which the fatal

altercation took place go to the weight of the evidence, and

petitioner's counsel was free to explore the subject on cross

examination.

Finally, even if I assume that there was misconduct on

the part of the prosecutor, given the weight of the evidence

against petitioner and the nature of the putative misconduct, the

misconduct was harmless. The principal witness against peti-

tioner, Matos, had danced with petitioner three times on the

night of the stabbing and clearly had the opportunity to observe

him closely. The stabbing occurred in the back seat of a taxi

cab where Matos was sitting and must have occurred within a few

34

feet of Matos. Matos' testimony was corroborated by Maradiag, a disinterested witness, who saw the events from his taxi stand. There is no suggestion in the record that Matos or Maradiag had any reason to fabricate their testimony. Given the weight of the evidence against petitioner, if there was any misconduct on the part of the prosecutor, it was harmless.

Thus, there was no misconduct on the part of the prosecutor at petitioner's trial, and even if there was misconduct, given the weight of the evidence against petitioner, it is not sufficiently serious to provide a basis for habeas corpus relief.

> b.  Allegedly Erroneous
>     Admission of the
>     Photograph of the
>     Scene of the Crime

Petitioner's final claim is that he was prejudiced by the introduction of Exhibit 10, the photograph of the scene of the crime, because it depicted a car that was not in precisely the same position as the taxi was at the time of the homicide.

Assuming without deciding that the admission of Exhibit 10 could theoretically rise to the level of constitutional error,[8] there was no error here. First, the photograph was

---

[8] A state trial court's decision to admit or exclude evidence is rarely a sufficient basis for the issuance of a writ of habeas corpus. See Dowling v. United States, 493 U.S. 342, 352 (1990);
(continued...)

35

admitted without objection from petitioner's counsel (Tr. 234-35).  Second, as set forth above, the prosecution established to appropriate foundation for the admission of the photograph.

Thus, there was no error in the admission of Exhibit 10.

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that the petition be denied in its entirety.

In addition, since petitioner has not made a substantial showing of the denial of a constitutional right, I also recommend that a certificate of appealability not be issued.  28 U.S.C. § 2253.  To warrant the issuance of certificate of appealability, "petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  Middleton v. Attorneys Gen., 396 F.3d 207, 209 (2d Cir. 2005) (per curiam) (internal quotation marks omitted); see also Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005) (per curiam).  For the reasons set forth above, I conclude that there would be no difference of opinion

---

[8](...continued)
Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998); Rosario v. Kuhlman, 839 F.2d 918, 924-25 (2d Cir. 1988) .

among reasonable jurists that the petition should have been reviewed in a different manner or that petitioner should be encouraged to proceed further.

V.   Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this Report and Recommendation to file written objections. See also Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, 500 Pearl Street, Room 640, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d